644 F.2d 1217
 GREEN BAY AND WESTERN RAILROAD CO., Ann Arbor Railroad
System, and State of Michigan Department of
Transportation, Petitioners,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents.
and
Consolidated Rail Corporation, Intervenor Respondents.
 Nos. 79-2491, 80-1106 and 80-1107.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 17, 1980.
Decided March 23, 1981.
As Modified on Denial of Rehearing and Rehearing Banc July 16, 1981.
 
 Daniel J. Sweeney, Ellen A. Efros and Charles W. Chapman, Washington, D. C., for petitioners.
 Lawrence H. Richmond, I.C.C., Washington, D. C., Charles N. Marshall, Consolidated Rail Corp., Philadelphia, Pa., for respondents.
 
 
 1
 Before FAIRCHILD, Chief Judge, SWYGERT, Circuit Judge, and CAMPBELL, Senior District Judge.*
 
 
 2
 WILLIAM J. CAMPBELL, Senior District Judge.
 
 
 3
 This appeal presents the question of whether Consolidated Rail Corporation's (ConRail) cancellation of joint rates with the Ann Arbor Railroad System (Ann Arbor) is consistent with the public interest, within the meaning of 49 U.S.C. § 10705(d). The Commission approved the cancellation of joint rates. Petitioners seek appellate review of the Commission's order in this Court. Jurisdiction is predicated on 28 U.S.C. § 2321, 2342(5). We reverse.
 
 
 4
 The petitioning railroads in this case are the Ann Arbor and the Green Bay and Western Railroad Co. (GB&W). The Ann Arbor operates a 300 mile line of railroad between Toledo, Ohio and Frankfort, Michigan. At Frankfort, the Ann Arbor line connects with its car ferries which transport railroad cars across Lake Michigan to Kewaunee, Wisconsin. At Kewaunee the car ferries connect with the GB&W which operates a line of railroad to Winona, Minnesota. The majority of freight traffic on these railroads moves from the west to the northeast. The GB&W connects with several major western railroads at Winona, including the Soo, the Chicago and North Western, the Milwaukee Road and the Burlington Northern at East Winona, Wisconsin. The Ann Arbor connects with seven eastern railroads at Toledo: ConRail; Grand Trunk Western; Baltimore & Ohio; Chesapeake & Ohio; Detroit, Toledo & Ironton; Norfolk & Western; and Toledo Terminal. The Ann Arbor, its car ferries and the GB&W together serve as a bridge carrier of rail traffic between the west and the northeast.
 
 
 5
 The Ann Arbor and GB&W compete with several other railroads for a share of transcontinental traffic. ConRail, for example, provides service between Chicago and numerous cities in the northeast. Burlington Northern and other large western lines also service Chicago from the west. Thus, a shipper in the western United States would have several alternative railroad routes for freight destined for the east coast. The freight could travel via the Chicago Gateway, via the GB&W and Ann Arbor, or on several southern routes. The competition for this transcontinental traffic gave rise to this litigation.
 
 
 6
 In 1978 the Interstate Commerce Commission (the Commission) approved a seven percent nationwide increase in rail freight rates, in Ex Parte No. 357, Increased Frt. Rates & Charges, Nationwide 8 Percent, 395 I.C.C. 740 (1978). The Ann Arbor elected not to participate in the increased rate and "flagged out" of the increase on 22 commodities.[1] The effect of this flag out was to prevent any railroad engaged in joint traffic with Ann Arbor from taking the seven percent rate increase with respect to the 22 selected commodities. This is so because joint rates may be increased only with the concurrence of all participating railroads. Thus, certain freight traffic originating in the west and destined for points east of Toledo would incur a lower freight cost if routed via the GB&W and the Ann Arbor than if that same traffic were routed via Chicago. The 22 selected commodities on which the Ann Arbor "flagged out" of the rate increase already had revenue to variable cost ratios in excess of 150 percent, which indicates that the existing rates were not predatory or unreasonable under the Commission's guidelines.[2] Ann Arbor's decision to forego the rate increase suggests a business judgment that maintaining the existing rates would result in increased traffic and ultimately prove more profitable.
 
 
 7
 In response to Ann Arbor's flag out, ConRail cancelled joint rates on five of twenty-two commodities.[3] These joint rates were replaced by proportional rates. A proportional rate is one which covers only a portion of movement of freight traffic. The new proportional rates covered only those portions of the movement of west to east traffic which moved over ConRail from Toledo to points east. In the majority of cases the new proportional rates exceeded rates for west to east traffic routed via the Chicago Gateway. ConRail's proportional rates also exceed what ConRail's share of the 7% increase would have been had the Ann Arbor not flagged out of the increase.
 
 
 8
 The Ann Arbor, GB&W, the State of Michigan and numerous affected shippers objected to ConRail's proportional rates. The Ann Arbor and GB&W objected to the cancellation of joint rates on the theory that it violated Ann Arbor's right of independent action, and that ConRail had failed to establish that the cancellation was "consistent with the public interest."[4] The Ann Arbor and GB&W were obviously concerned about the amount of traffic that would be lost to the Chicago Gateway railroads as a result of the new proportional rates. Faced with the prospect of paying several hundred dollars more for freight service via the Ann Arbor, a shipper would route shipments via the Chicago Gateway instead.
 
 
 9
 The State of Michigan manages and operates the Ann Arbor and owns a substantial portion of its track. The State had spent a considerable amount in aiding the Ann Arbor, and was committed to maintaining it as a self-sustaining railroad, serving shippers in Michigan. The State Department of Transportation was concerned about insufficient regional and intrastate traffic and feared that unless the Ann Arbor could serve as a bridge carrier[5] for transcontinental movements it would not survive. The cancellation of joint rates was, therefore, viewed as a very serious threat to the Ann Arbor and the GB&W's financial viability.
 
 
 10
 The central issue before the Commission was whether ConRail's actions were consistent with the public interest. ConRail has the burden of demonstrating that the cancellations are consistent with the public interest. 49 U.S.C. § 10705(d). The Interstate Commerce Act requires that the Commission, in considering joint rate cancellations;
 
 
 11
 (1) compare the distance traveled and average transportation time and expense required using (A) the through route, and (B) alternative routes, between places served by the through route;
 
 
 12
 (2) consider any reduction in energy consumption that may result from cancellation; and
 
 
 13
 (3) consider the overall impact of cancellation on the shippers and carriers that are affected by it.
 
 
 14
 The Commission considered these factors and concluded that ConRail's cancellation of joint rates was consistent with the public interest.
 
 
 15
 In an effort to show that time and distance factors supported the cancellation, ConRail introduced a 24 shipment sample comparing routes with and without Ann Arbor's participation. The sample indicated the Ann Arbor routes were, on the average, longer, more time consuming and less profitable. The sample also reflected higher costs to the shippers using the Ann Arbor route. In response to the argument that the cancellation of joint rates was, in effect, a route closure, ConRail cited the relatively small number of shipments via the Ann Arbor, suggesting that the loss would be minimal. ConRail also projected significant losses for itself and other joint line carriers as a result of the Ann Arbor's flag out of the seven percent increase. The cancellation of joint rates, ConRail argued, was simply a reasonable response to the Ann Arbor flag out.
 
 
 16
 The Commission found the ConRail sample inconclusive. It noted that California and Indiana origins accounted for 11 of the 24 movements in the sample and that such movements were not likely to be routed via the Ann Arbor.[6] The Commission also noted that the ConRail sample included no movements originating in Washington, Idaho, Canada, or the upper midwest. The sample included no Minnesota, Wisconsin or Michigan origins or destinations, though U. S. Railway Association data indicates that the majority of Ann Arbor's shipments originate in those states.[7] The Commission noted that when traffic between the Pacific Northwest, Montana and the Upper Midwest was considered, the Ann Arbor routes were shorter, or no more than 10 percent more circuitous than the Chicago Gateway.[8]
 
 
 17
 The Commission considered energy consumption and efficiency considerations to be more significant. Here, the Commission focused on use of the cross-lake car ferries in the GB&W and Ann Arbor route. There was considerable dispute as to the efficiency and potential efficiency of the car ferry. The Ann Arbor presently operates car ferry service between Frankfort, Michigan and Kewaunee and Manitowoc, Wisconsin. In the late 1960's the Ann Arbor operated five vessels between Frankfort and four ports on the Wisconsin side of Lake Michigan. In 1970 the Penn Central and seven other Northeast Railroads, including the Ann Arbor, went bankrupt. Car ferry service to Menominee and Manistique, Michigan was discontinued and two vessels were sold. In 1972 a third vessel was eliminated from cross-lake service.[9] In 1972 a total of 50,957 cars were carried across Lake Michigan on the Ann Arbor car ferries.[10] Of that number 33,206 were full cars, and the remaining 17,751 were empty.[11] In 1973 the total number of cars was reduced to 39,666 cars due to the abandonment of the Manitowoc service and the scrapping of a vessel. Approximately one-third of those cars were empty.[12] In 1973 the vessel A. K. Atkinson broke a crankshaft and was not repaired. That left one vessel, the Viking, providing service between Frankfort and Kewaunee from 1973 until the restoration of a second vessel in January 1979.[13]
 
 
 18
 While several car ferry routes were discontinued during the early 1970's, the Kewaunee-Frankfort traffic showed a slight increase in total carloads through 1974.[14] There was also testimony that while repairs to the Atkinson's broken crankshaft would have been costly, there was adequate insurance to cover the repairs.[15] The picture which emerges from uncontradicted testimony before the Commission's Administrative Law Judge (ALJ) is a general lack of concern by the Ann Arbor's parent company for the Railroad's future. Given the poor financial condition of the railroad and the entire industry at the time, that low level of interest is understandable.
 
 
 19
 On April 1, 1976 much of the Ann Arbor's property was conveyed to the State of Michigan. ConRail then entered into a contract with the State to operate the Ann Arbor. The State looked to ConRail only after negotiations with other viable railroads in the region broke down.[16]
 
 
 20
 ConRail's operation of the Ann Arbor was very much a marriage of last resort. ConRail included a clause in its contract with the State which relieved ConRail of any liability for diversion of traffic from the Ann Arbor.[17] ConRail made no effort to restore the Ann Arbor to financial viability. Ann Arbor routes were not listed in ConRail's system-wide maps or guides. The ConRail sales office informed shippers that the car ferries did not run in winter, and, in fact, car ferry service was reduced to three times per week. Train service was also reduced to every other day.[18] There was also shipper dissatisfaction with ConRail's management of the Ann Arbor and lower revenues to other railroads which connected with the Ann Arbor.[19]
 
 
 21
 On October 1, 1977 operation of the Ann Arbor was transferred to the Michigan Interstate Railway Company (MIRC). The goal of MIRC management was to revitalize the Ann Arbor and return it to profitability by April 1981. Upon assuming management of the Ann Arbor, MIRC immediately increased service. Shippers and connecting railroads were contacted and informed of the change in management and upgraded service. Service to Manitowoc, Wisconsin was resumed and daily service to Kewaunee was resumed. A program for rehabilitating locomotives was initiated and over 100 new boxcars were purchased. New hoppers were also acquired to provide service for sand and grain shippers. Maintenance facilities and equipment were upgraded. A three and one-half year program to repair 125 miles of track was initiated with State and Federal assistance. A new communication system was installed which eliminated a $5,000 per year telephone bill.[20]
 
 
 22
 MIRC management also initiated a program to increase revenue to the car ferries from non-rail traffic. This traffic consists of tractor trailers, automobiles, recreational vehicles, and, in the summer, vacation traffic. Income from this traffic helps to reduce the cost of moving rail cars over the car ferry. MIRC established a goal of $1 million revenue for miscellaneous traffic, which would reduce rail car costs for the car ferry to near equivalence with the cost of hauling by train. In 1978, $532,000 in revenues were generated by miscellaneous traffic, a 37% increase over the prior year.[21]
 
 
 23
 Management of the Ann Arbor was subsidized by the State of Michigan. The projected deficit for the Ann Arbor for the first year of MIRC management was $6.3 million. The actual deficit was.$4.1 million, and the $2.2 million of unused subsidy was returned to the State.[22]
 
 
 24
 Nevertheless, the Commission concluded that efficiency factors favored the Chicago Gateway over the GB&W and Ann Arbor route. This second factor required for consideration under 49 U.S.C. § 10705(d)(2) was clearly the crucial factor in the decision to permit ConRail to cancel the joint rates. The Commission relied heavily on the U.S. Railway Association's (USRA) exclusion of the Ann Arbor from the Final System Plan.[23] The USRA's analysis appears to have been substantially based on a 1975 study of car ferry operations prepared by the consulting firm of A. T. Kearney, Inc.[24] That study analyzed three car ferry operations, one of which was the Ann Arbor. The Kearney Report was based on data available only through the first seven months of 1974. The Report analyzed the operating costs of the car ferry operation up to that time and concluded that it far exceeded comparable rail costs. The Kearney study calculated the actual cost of transporting a car on the 65 mile trip across Lake Michigan at $143. This breaks down to a cost of $2.20 per car mile for the car ferry as compared to $1.00 per car mile for rail transportation. The Report also found the car ferries to be more fuel-consumptive per mile traveled.[25] The study noted, however, that without major modifications in the vessel, the car ferry would significantly reduce per car costs if operated at full capacity. The cost per car at capacity levels was calculated at $90.00 or approximately $1.38 per car mile. If the car ferries were upgraded, per car costs would decline further, to $66.00 per car. However, in its present (then mid 1974) level of service, the Report concluded, "Ann Arbor car ferry service ... is significantly more expensive per loaded car than most of the alternatives considered ..."[26]
 
 
 25
 The findings and analysis of the Kearney Report were rebutted in a critique prepared by Vincent Malanaphy under contract with the State of Michigan.[27] The Malanaphy study pointed to several errors in the Kearney cost calculations. For example, the Kearney study used depreciation costs for two vessels, while only one was in operation.[28] Also, the Kearney analysis included certain expenses as "marine costs" because they were performed at the port. Yet, as Malanaphy's analysis points out, interchange costs would have been incurred even if the GB&W and Ann Arbor connected at a normal railroad interchange. Thus, a portion of the interchange costs attributed to the car ferry should have been included as rail costs, not marine costs. After adjusting for these items, Malanaphy concluded that the cost per car for existing service was actually $85.00 rather than $143.00.
 
 
 26
 The Malanaphy study also disputed the Kearney cost per car figures for upgraded car ferry service. Malanaphy's study pointed out that one of the principal economies derived from use of a new vessel would be a reduction in crew from 35 to 24 men. Also, a new vessel could be equipped with a separate deck for tractor trailers and other heavy machinery which would increase revenues without additional operating costs. After making these cost adjustments, and using a traffic estimate of 3,913 cars per month, Malanaphy found that the cost per car of the cross-lake trip would be $27.00 rather than the $66.00 figure in the Kearney study.
 
 
 27
 Of equal importance to the relative efficiency analysis is the cost of traffic traveling through the Chicago Gateway. The Commission relied on the USRA's conclusion that per car costs were lower via the Chicago Gateway than via the Ann Arbor. Again, the basis for this conclusion appears to have been the Kearney Report. Malanaphy criticized the Kearney study's use of average interchange costs rather than actual interchange costs associated with the Chicago Gateway.[29] There was also evidence that traffic routed through the Chicago Gateway experienced considerable delays. Malanaphy testified that shipments which averaged 5.5 days to 8 days via the cross-lake route required 7.3 to 12.5 days via the Chicago Gateway.[30] In his report, he claimed that the Chicago Gateway was "the highest costing and slowest moving switching district in the country."[31] Malanaphy's characterization of the Chicago Gateway was corroborated by shippers[32] and a railroad cost consultant.[33]
 
 
 28
 The Commission apparently recognized that the evidence on the issue of the relative efficiency of the two routes was not conclusive. After a brief discussion of the Ann Arbor's exclusion from the Final System Plan, the Commission concluded its discussion of relative efficiency by stating:
 
 
 29
 Notwithstanding the conflicting evidence as to the relative costs of all-rail versus car ferry-rail service, common sense forces us to conclude that a car ferry movement inevitably will be less efficient and more costly than a comparably direct all-rail routing. 362 I.C.C. at 508.
 
 
 30
 Chairman O'Neal, in dissent, faulted the majority for failing to take into account the expense of using the Chicago Gateway and, as the majority candidly acknowledged, for basing its conclusion "chiefly on assertions, not data." 362 I.C.C. at 517.
 
 
 31
 The final consideration mandated by Section 10705(d)(3) is an evaluation of the impact of the joint rate cancellation on affected shippers and carriers. Numerous shippers in the upper Midwest testified that they would be adversely affected by the cancellation of joint rates. In addition, both GB&W and the Ann Arbor presented evidence of adverse financial consequences flowing from ConRail's cancellation of joint rates. GB&W is presently a profitable railroad. The loss of bridge traffic caused by ConRail's action, it is argued, would seriously threaten GB&W's continued profitability. The Ann Arbor is currently subsidized by the State of Michigan, yet its financial condition is improving. The railroad will probably never attain financial independence, however, if the cancellation of joint rates is upheld.
 
 
 32
 The Commission found that the evidence supported the Ann Arbor and GB&W position. The Commission rather unequivocally stated:
 
 
 33
 ... protestants have adequately demonstrated, and it has not been rebutted, that the cancellation would adversely affect the Ann Arbor, its cross-lake car ferry, the GB&W, the local industries which are directly dependent upon the two railroads, and the employees of all these concerns.[34]
 
 
 34
 Nevertheless, the Commission went on to add: "... we are not persuaded that the damage will be as extensive as alleged."[35] The evidence relied on in support of that conclusion was the fact that the number of carloads carried over the Ann Arbor had increased in 1978, and Ann Arbor's projections for future years computed prior to the ConRail cancellation of joint rates anticipated further increases.
 
 
 35
 The Commission's analysis was limited in scope to the seven commodities on which ConRail cancelled joint rates. The Ann Arbor argued, however, that the seven selected commodities were, in effect, nothing more than a test case and that cancellation of joint rates would follow for other commodities. One shipper testified that there was "no question" in his mind that joint rates would be cancelled for his product as well.[36]
 
 
 36
 After discussing the considerations outlined in Section 10705(d) for determining whether a rate cancellation is in the public interest, the Commission proceeded to a discussion which can, at best, be characterized as a balancing of adverse effects. The Commission noted that the Ann Arbor's flag out of the seven percent increase gave it a competitive advantage over the Chicago Gateway for some transcontinental shipments. If the Ann Arbor attracted shipper traffic which might otherwise be routed through Chicago, ConRail would clearly sustain a revenue loss. While ConRail would likely carry those shipments between Toledo and East Coast cities, it would lose traffic on the Chicago-Toledo portion of the route to the Ann Arbor. The Commission found this unacceptable, since ConRail was a major carrier providing "essential rail service to the entire Northeast."[37] That was clearly a major factor in the Commission's decision to permit cancellation of the joint rates. A competitive rate schedule which resulted in a loss of revenue to ConRail was unacceptable, irrespective of the factors set out in Section 10705(d), simply because it was ConRail who would end up the loser. The Commission attempted to justify this reasoning by citing generally "the objectives of the 3R Act, the 4R Act and the FSP (Final System Plan)."[38] Since Congress had created ConRail to become a "financially self-sustaining rail system adequate to meet the (Northeast) region's rail transportation needs," it was entitled to protection from competition from a railroad of "marginal importance" such as the Ann Arbor.[39] The Commission noted that the USRA had excluded the Ann Arbor from the Final System Plan due to the marginal nature of the Ann Arbor.
 
 
 37
 The Commission went on to discuss the proportional rates substituted by ConRail. ConRail had claimed that the proportional rates were merely what its division of revenue via Toledo would have been had the Ann Arbor not flagged out of the 7% increase. The Commission noted that the proportional rates were, in fact, higher than that, yet concluded that they were not above a "maximum reasonable level."[40]
 
 
 38
 The final substantial issue addressed by the Commission is whether the cancellation of joint rates violated the Ann Arbor's right of independent action. The Ann Arbor argues that cancellation of joint rates immediately following a decision to flag out of a rate increase is an unlawful response to the flag out. If ConRail can, in effect, punish a railroad for declining to raise rates then no railroad will have the right to act independently in setting rates. The Commission recognized this principle of independent action as recently as 1979 in Cancellation of Intermediate Routing Michigan Northern Railway, 361 I.C.C. 224 (1979). The notion of independent action in rate setting is also recognized in the Interstate Commerce Act. 49 U.S.C. § 10706(c)(2)(C) prohibits the Commission from approving a rate agreement unless "each party to the agreement has the absolute right under it to take independent action ..." While Congress has protected the right to take independent action, it has not defined it. The Commission appears to have a similar difficulty defining independent action as well. While the Commission argues that the right of independent action is inapplicable in the instant case, it applied it in the Michigan Northern cases. The Commission contends that the statutory protection applies only to parties to rate-making agreements and that the Ann Arbor was not a party to the TEA-ER[41] rate bureau agreement at the time the seven percent increase was proposed. The Ann Arbor disputes this factual assertion in its reply brief, and has submitted a copy of its "execution and assent" to the rate bureau agreement.[42] Thus, it appears that the Commission and the railroads cannot agree on who is a party to the rate bureau agreement, much less the legal significance of entering into such an agreement.
 
 
 39
 Ultimately, the problem of defining independent action in the rate making context is that one carrier's actions will necessarily have an effect upon others. In the instant case the Ann Arbor's flag out threatened to prevent ConRail from taking advantage of the seven percent increase, and ConRail's new proportional rates made the Ann Arbor a financially unattractive route to shippers of certain commodities. Each exercise of independent action directly and adversely affected another railroad. The Commission's inability to fashion a workable definition of independent action which can reconcile such conflicts is evidenced in the present case. The Commission, recognizing the contrary holding in Michigan Northern, simply declared it "overruled to the extent it differs with our conclusions in this proceeding."[43] Unfortunately, the Commission made no attempt to define the extent of conflict between the two cases, or offer some rationale as to why the prior holding had become untenable in one year.
 
 
 40
 The Commission also found ConRail's new proportionals to be in violation of the long and short haul provisions of Section 10726.[44] However, the Commission granted ConRail's request for relief from application of those provisions, and petitioners do not appeal that aspect of the Commission's decision.
 
 
 41
 With this factual background we now address the recent Congressional reform of the law in this area, and its effect on the issues raised in this case.
 
 
 42
 LEGISLATIVE DEVELOPMENTS IN THE REGULATION OF THE RAILROAD INDUSTRY.
 
 
 43
 The bankruptcy of the Penn Central Transportation Company and seven other major northeast railroads in 1970 culminated several decades of decline of the railroad industry. Prompted by this crisis, Congress embarked on a series of legislative reforms aimed at rejuvenating the industry as a whole, and particularly in the northeast.
 
 
 44
 The first major legislation was the Regional Rail Reorganization Act of 1973 (the 3R Act).[45] The immediate purpose of the 3R Act was the reorganization of the bankrupt northeast rail system. To that end, Congress established the United States Railway Association (USRA), and the Final System Plan of reorganization. The Act created ConRail, a new for-profit corporation, to acquire and operate the rail properties conveyed pursuant to the Final System Plan. The task of formulating and implementing the Final System Plan was left to the USRA. Congress did provide the USRA with some guidance as to the factors to be considered in drafting the plan. Those factors include:
 
 
 45
 the need for and the cost of rehabilitation and modernization of track, equipment, and other facilities; methods of achieving economies in the cost of rail operations in the region; means of achieving rationalization of rail services and the rail service system in the region; marketing studies; the impact on railroad employees; consumer needs; traffic analyses; financial studies; and any other factors identified by the Association ... or in the report of the Secretary (of Transportation).[46]
 
 
 46
 Pursuant to the 3R Act the eight bankrupt northeast railroads were reorganized into ConRail. The Ann Arbor was a part of the ConRail System. Initial projections showed ConRail becoming a profitable entity in 1979. ConRail has yet to produce any profit, however, and continues to receive Federal subsidies.
 
 
 47
 The brief marriage between ConRail and the Ann Arbor has been discussed and needs no repetition here. It is sufficient to summarize ConRail's approach to the Ann Arbor as a phase out of service and diversion of traffic to the Chicago Gateway. The Ann Arbor's exclusion from the Final System Plan by the USRA is consistent with the phase out. The Commission and ConRail contend that these actions and the current joint rate cancellation are not only consistent with the policy of the 3R Act, but mandated by it.
 
 
 48
 Congress clearly and unambiguously set forth the goals of both the Final System Plan and the 3R Act as a whole. In the words of the drafters, those goals are:
 
 
 49
 a financially self sustaining rail service system in the region ... adequate to meet the rail transportation needs and service requirements of the region ... (and to the extent possible) the preservation ... of existing patterns of service by railroads ...[47]
 
 
 50
 However, it does not necessarily follow, as respondents suggest, that the Ann Arbor has no part in the achievement of those goals. While Congress delegated the task of attaining the goals of the 3R Act to the USRA and the Commission, all actions taken by those bodies do not necessarily bear the imprimatur of Congress.[48] In the instant case, the USRA and the Commission have concluded that the Ann Arbor should not be permitted to compete with ConRail for transcontinental traffic.[49] Yet that conclusion must be supported by evidence, not merely a "common sense" view without support in the record. Otherwise, the Commission's decision to permit cancellation of joint rates cannot be supported by a reference to the goals adopted by Congress in the Final System Plan. We find nothing in either the text or the Legislative history of the 3R Act which indicates that the Ann Arbor may not compete for transcontinental traffic, through flag outs or other reasonable rate changes.
 
 
 51
 The Railroad Revitalization and Regulatory Reform Act of 1976 (the 4R Act) was the next significant Congressional response to the financial crisis in the industry. The 4R Act is a more far-reaching effort than its immediate predecessor. In enacting this legislation Congress recognized that an out-dated over-regulated structure was at least a contributing cause of the industry's crisis, and sought to update and provide for greater flexibility in that structure. Clearly, a major goal of the 4R Act is to permit greater competition in the railroad industry.[50]
 
 
 52
 While Congress recognized that greater competition was in the public interest, it did not lose sight of the dangers of unrestrained competition. The Act prohibits "unjust or unreasonable" rates, and defines those terms to include any rate which does not "contribute to the going concern value" of the carrier.[51] The burden is placed on the carrier to establish the reasonableness of a proposed rate.[52] Nevertheless, a principal goal of the 4R Act is unquestionably to reinstate competitive market forces in the railroad industry. A return to a less regulated, more competitive structure would, it was hoped, force the industry to operate more efficiently. This is reflected in the Senate Report:
 
 
 53
 If railroads are to regain lost traffic, or even retain present traffic they must be able to lower their rates, innovate new services, and respond to new and changing circumstances.[53]
 
 
 54
 The Commission asserts that the 4R Act also designates ConRail as the carrier for essential rail service in the northeast. The 4R Act does address the implementation of the Final System Plan. However, Congress was concerned primarily with the corporate and financial structure of ConRail. For example, the Act permitted ConRail to issue additional preferred stock as payment for interest on existing debentures.[54] The 4R Act, while continuing the commitment to the Final System Plan, neither immunizes ConRail from competition nor exempts ConRail from the statutory requirement that joint rate cancellations be in the public interest.
 
 
 55
 The 4R Act also affords smaller local rail services greater protection from abandonment and discontinuances.[55] The Act provides for financial assistance to states to cover the cost of improvements in local rail service, and Michigan has taken advantage of that assistance in rehabilitating the Ann Arbor's facilities.
 
 
 56
 The 4R Act, like all far-reaching legislation, does have the potential for conflict resulting from competing goals. The goals of promoting competition in the industry; protecting local railroads; and preserving rail service in the northeast corridor may, as the instant case demonstrates, not always be mutually attainable. When this conflict arises in a given case, courts should adhere to the plain language of the statute. The 4R Act explicitly requires carriers to show that rate cancellations are consistent with the public interest and sets forth the criteria for making that determination.[56] That is the only provision of the Act which directly applies in the instant case. The general policies of the Act outlined above are relevant to our analysis only to the extent that the plain language of the statute is silent or ambiguous.
 
 
 57
 THE COMMISSION'S APPROVAL OF CONRAIL'S CANCELLATION OF JOINT RATES
 
 
 58
 The considerations set forth in Section 10705(d) reflect a long-standing doctrine of Administrative Law that an Agency must make specific factual findings to support a given result. See Wichita Railroad Light Co. v. Public Utilities Commission of Kansas, 260 U.S. 48, 58, 43 S.Ct. 51, 54, 67 L.Ed. 124 (1922). Without such findings the Agency's action is void. To withstand judicial scrutiny the Agency's findings must be supported by substantial evidence on the record of an agency hearing. 5 U.S.C. § 706(2)(E); Interstate Commerce Commission v. Union Pacific Railway Co., 222 U.S. 541, 548, 32 S.Ct. 108, 111, 56 L.Ed. 308 (1912). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938).
 
 
 59
 In the instant case the record is so lacking in evidentiary support for the Commission's finding that ConRail's cancellation was in the public interest, that the Commission's discussion of the statutory considerations amounts to nothing more than lip service. Section 10705(d) is a recent addition to the Interstate Commerce Act which has received very limited judicial consideration. Nevertheless, the long-established substantial evidence requirement governs the agency's findings under this new provision.
 
 
 60
 The Commission concedes that the distance and time factors are inconclusive. ConRail's sample of shipments is heavily loaded with shipments which would ordinarily not travel via the Ann Arbor due to distance factors. Since time and distance factors do not support the rate cancellation, ConRail must meet its burden solely on the other statutory criteria: energy efficiency and the impact on shippers and carriers.
 
 
 61
 The Commission relied heavily on efficiency considerations in approving the rate cancellation. Yet the evidence is hardly conclusive on that issue. The Kearney Report does indicate that the car ferries are an inefficient means of transportation. Yet, that study was conducted in 1974, and was not updated to reflect many of the improvements initiated under MIRC management. Perhaps more significant is the fact that the accuracy of the Kearney study was seriously questioned by Malanaphy's critique and testimony. The errors in the Kearney Report which Malanaphy described were never rebutted by ConRail. Also, ConRail failed to rebut Malanaphy's corroborated testimony to the effect that the Chicago Gateway is expensive and causes substantial delays in traffic. Indeed, the Commission at one point candidly acknowledged that its analysis of relative efficiency reflected "common sense" considerations rather than empirical analysis. Such visceral reactions are hardly adequate to meet the substantial evidence requirement.
 
 
 62
 The Commission's analysis of the convenience to shippers and carriers is equally unpersuasive. The Commission acknowledges that the Ann Arbor, GB&W, and local shippers will be adversely affected by the cancellation of joint rates. Nevertheless, the Commission finds the potential diversion of traffic from ConRail more significant due to ConRail's designation in the Final System Plan. Ultimately, the Commission's decision rests on the belief that ConRail is simply the more important railroad. We think this analysis places too much significance in the Final System Plan. The goal of Congress in enacting the plan was to achieve a "financially self-sustaining rail service system."[57] It was not to enshrine any one railroad or group of railroads with a preferred status in rate making or rate cancelling. It was certainly not designed to immunize ConRail from the increased competition in the industry envisioned by the 4R Act. The finding that ConRail will suffer greater adverse effects if cancellation of joint rates is not permitted is not supported by evidence in the record of the Agency hearing. Rather, the support for the Commission's conclusion rests with an interpretation of the 3R Act which we consider unsound.
 
 
 63
 The Commission's finding that the cancellation of joint rates is consistent with the public interest is not supported by substantial evidence. We, therefore, reverse that decision. The question of independent action, however, requires further discussion. What, for example, would be an appropriate response to the Ann Arbor flag out? Chairman O'Neal, in dissent, suggested that ConRail could effectively take advantage of the seven percent increase by means of a surcharge. He also suggested that proportional rates which were strictly confined to a proportionate share of the seven percent increase would also pass muster under the public interest standard of Section 10705(d).[59] The Commission on remand is urged to engage in a reasoned analysis on the meaning of independent action, and formulate a more workable standard than is presently employed.[59] Clearly, rate changes which have profound adverse effects on other railroads are not consistent with a workable definition of independent action.
 
 
 64
 The Commission's decision must be reversed due to the lack of substantial evidence indicating that the cancellation of joint rates will really serve the public interest. Yet there is an equally troubling aspect of the Commission's action in this case. The Commission appears to have difficulty dealing with the addition of competition to the railroad industry. We believe the actions taken by the management of the Ann Arbor are precisely what Congress contemplated in the 4R Act.[60] Under MIRC management the Ann Arbor is attracting new traffic, increasing efficiency and providing prompt and reliable service to shippers. It is also moving toward profitability ahead of schedule. The GB&W is already operating at a profit. These two railroads have acted together to provide shippers with an alternative to the costly and slow moving Chicago Gateway. The Commission should demonstrate greater support for competitive conduct of this type than is reflected in the instant case.[61]
 
 
 65
 For these reasons the Commission's decision is Reversed, and the case is Remanded to the Commission with instructions to enter judgment in accordance with the views expressed herein.
 
 
 66
 SWYGERT, Circuit Judge, dissenting.
 
 
 67
 Judge Campbell correctly states the ultimate question in this agency review: whether the Commission was warranted in concluding that ConRail's cancellation of joint rates was consistent with the public interest, within the meaning of 49 U.S.C. § 10705(d). The majority holds that such warrant was lacking. I am constrained to take the opposite view.
 
 
 68
 No separate exegesis for my reasoning shall be attempted. Rather, I believe the Commission's detailed decision furnishes sufficient factual and legal support for the result it reached. Contrary to what the majority thinks, the Commission's decision, in my judgment, is supported by substantial evidence. The Commission carefully applied the criteria stated in section 10705(d); it carried out the congressional policy contained in the Regional Rail Reorganization Act of 1973. Finally, the Commission fully protected Ann Arbor's right to reasonable proportional rates and non-discriminatory treatment by connecting carriers.
 
 
 69
 Judicial review in this area is narrow. We should defer to the Commission's expertise and broad rulemaking discretion. We should disapprove its judgment only if that judgment is unreasonable. As has so often been said, courts when reviewing administrative decisions ought not convert themselves into a superagency. I fear the court here has done just that. It has gone beyond its function and stepped into the shoes of the Commission. I would uphold the Commission's judgment and deny review.
 
 
 
 *
 The Honorable William J. Campbell, Senior District Judge for the Northern District of Illinois, is sitting by designation
 
 
 [1]
 Rate increases are proposed by rate bureaus and approved by the Commission. A railroad not wishing to participate in the increase "flags out" by notifying the publishing rate bureau. A "flag out" may be limited to certain commodities or may apply to the entire rate increase
 
 
 [2]
 A rate is presumed reasonable if it equals or exceeds the variable costs of providing the transportation in question. 49 U.S.C. § 10701(a), (b)(2)(A). That presumption may be rebutted by clear and convincing evidence. In the instant case the parties do not dispute that the Ann Arbor's rates after the flag out were reasonable
 
 
 [3]
 Those five commodities are: canned and preserved fruit and vegetables; other foodstuffs; wood particleboard; soda ash; manufactured iron and steel
 
 
 [4]
 The statutory standard for rate cancellations set out in 49 U.S.C. § 10705(d)
 
 
 [5]
 A bridge carrier carries freight which does not originate or terminate on its lines. For example, the Ann Arbor serves as a bridge carrier for movements of soda ash from Wyoming to the east coast
 
 
 [6]
 362 I.C.C. at 506
 
 
 [7]
 Exhibit No. 18, p. 40, U.S. Railway Association Ann Arbor Car Ferry Data by Destination for 1973
 
 
 [8]
 362 I.C.C. at 507. The Commission relied on the protestant's sample of 26 sample movements for that finding
 
 
 [9]
 Testimony of Vincent Malanaphy, Michigan Interstate Railway Co. (Tr. p. 261)
 
 
 [10]
 Report of Kearney Management Consultants. Ex. 18, p. 12
 
 
 [11]
 Since the volume of eastbound traffic almost doubled westbound traffic, empty cars were often carried back to their western origin cities
 
 
 [12]
 Kearney Report, p. 12
 
 
 [13]
 Malanaphy testimony (Tr., p. 273)
 
 
 [14]
 Kearney Report, p. 14
 
 
 [15]
 Malanaphy testimony (Tr., p. 293)
 
 
 [16]
 Malanaphy testimony (Tr. p. 261-262). Negotiations with the Grand Trunk; Detroit, Toledo & Ironton; Chessie System; and Norfolk & Western proved fruitless
 
 
 [17]
 Malanaphy testimony (Tr., p. 262)
 
 
 [18]
 Malanaphy testimony (Tr., p. 264)
 
 
 [19]
 GB&W and the Detroit Toledo and Ironton are two principal examples
 
 
 [20]
 Malanaphy testimony (Tr., pp. 273-279)
 
 
 [21]
 Malanaphy testimony (Tr., pp. 277-282)
 
 
 [22]
 Malanaphy testimony (Tr., p. 279)
 
 
 [23]
 The "Final System Plan" is a product of the Regional Rail Reorganization Act of 1973, (The 3R Act), Pub.L.No. 93-236, 87 Stat. 985 (1974). That Act, which is discussed in greater detail later in this opinion, established the U.S. Railway Association and charged it with the task of developing a Final System Plan for reorganization of the bankrupt northeast railroads
 
 
 [24]
 The Kearney Report, dated January 20, 1975, was admitted as Exhibit 18 in the record before the ALJ
 
 
 [25]
 Kearney Report, Ex. No. 18, p. 30
 
 
 [26]
 Ex. No. 18, p. 3
 
 
 [27]
 A Review of A. T. Kearney Study of Carferry Operations, Ex. No. 19
 
 
 [28]
 Id. p. 1. See also Malanaphy testimony (Tr., p. 362)
 
 
 [29]
 Ex.No. 19, p. 8
 
 
 [30]
 Malanaphy testimony (Tr., p. 365)
 
 
 [31]
 Ex.No. 19, p. 8
 
 
 [32]
 Testimony of David Victor, Copper Range Co. (Tr., p. 216-218)
 
 
 [33]
 Gerald W. Fauth, Jr. (Tr., p. 515)
 
 
 [34]
 362 I.C.C. at 508
 
 
 [35]
 362 I.C.C. at 509
 
 
 [36]
 Testimony of David Victor, Copper Range Co. (Tr. p. 220)
 
 
 [37]
 362 I.C.C. 511
 
 
 [38]
 362 I.C.C. 511
 
 
 [39]
 Id
 
 
 [40]
 362 I.C.C. at 512
 
 
 [41]
 Traffic Executive Association Eastern Railroads
 
 
 [42]
 Appendix A to petitioner Ann Arbor Railroad System's Reply Brief
 
 
 [43]
 362 I.C.C. at 513
 
 
 [44]
 49 U.S.C. 10726(a)(1) prohibits carriers from charging more for transporting like property over a shorter distance than over a longer distance on the same route in the same direction
 
 
 [45]
 Pub.L.No.93-236, 87 Stat. 984 (1974)
 
 
 [46]
 Pub.L.No.93-236, 87 Stat. 984, Sec. 206(b)
 
 
 [47]
 Pub.L.No.93-236, 87 Stat. 984, Sec. 206(a)
 
 
 [48]
 See Davis, Administrative Law Text 3rd Ed. (1972), Ch. 2
 
 
 [49]
 The Commission, after discussing the Ann Arbor's attempt to attract overhead traffic by flagging out of the seven percent increase, concludes: ... the flag out may be viewed as an artificial device to accomplish goals other than those adopted by Congress in the FSP. 362 I.C.C. at 512
 
 
 [50]
 Section 101(b)(2) of the 4R Act states that one policy of the Act is "to foster competition among all carriers by railroad and other modes of transportation."
 
 
 [51]
 Pub.L.No.94-210, 90 Stat. 31, Section 202(b)
 
 
 [52]
 Id. Section 202(f)
 
 
 [53]
 S.Rep.No.499, 94th Cong., 2nd Sess. (1976), reprinted in (1976) U.S.Code, Cong. & Ad.News, 14, 25
 
 
 [54]
 Pub.L.No.94-210, Sec. 306
 
 
 [55]
 Id. Sec. 802
 
 
 [56]
 Pub.L.No.94-210, Sec. 203(a) later recodified at 49 U.S.C. § 10705(d)
 
 
 [57]
 Pub.L.No.93-236, 87 Stat. 984, Sec. 206(a)(1)
 
 
 [58]
 See 362 I.C.C. at 515
 
 
 [59]
 Again, it is a fundamental principle of Administrative Law that an agency may change course only by a reasoned analysis as to why prior policies are no longer valid. See Greater Boston Television Corp. v. F. C. C., 444 F.2d 841 (D.C.Cir.1970), cert. denied 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971)
 
 
 [60]
 As Judge Hoffman recently observed in Atchison, Topeka and Santa Fe Railway Company v. United States, 606 F.2d 442, 445 n.3 (4th Cir. 1979), there is a "strong congressional conviction" in the 4R Act to "foster competition among railroads."
 
 
 [61]
 We note that although the Commission was represented by counsel who argued in support of the Commission's order, the Department of Justice informed the Court that the United States, as statutory respondent, neither supports nor opposes the order of the Interstate Commerce Commission