The COMMISSIONER OF TRANSPORTATION OF the STATE OF NEW YORK, Petitioner,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents.

No. 1424, Docket 84–4017.

United States Court of Appeals, Second Circuit.

Argued June 25, 1984.

Decided Sept. 18, 1984.

Carmine J. Clemente, Albany, N.Y. (Darrell W. Harp, William J. Dwyer, Eric M. Kerness, Albany, N.Y., counsel to the Com'r of Transp. of the State of N.Y., of counsel), for petitioner.

J. Paul McGrath, Washington, D.C. (John J. Powers, III, John P. Fonte, Dept. of Justice, John Broadley, Ellen D. Hanson, Evelyn G. Kitay, I.C.C., Washington, D.C., of counsel), for respondents.

Patrick J. Fogarty, Mineola, N.Y. (Lat J. Celmins, Phoenix, Ariz., of counsel), for intervenor.

Before KEARSE, PIERCE, and MARKEY,* Circuit Judges.

PIERCE, Circuit Judge.

We consider herein a challenge to the action of the Interstate Commerce Commission ("ICC" or "Commission"), preempting New York State regulation of intrastate bus fares and prescribing such rates itself. We conclude that the ICC acted within the bounds of its statutory authority and that its decision was neither arbitrary nor capricious. Consequently, we affirm.

## I. BACKGROUND

In May of 1983, Greyhound Lines, Inc. ("Greyhound") applied to the New York State Department of Transportation ("NYDOT") for permission to increase its New York intrastate passenger rates by forty percent. In response to requests by the NYDOT, Greyhound produced various financial exhibits pertaining to both its New York and national operations. Among these was a corporate income statement for the quarter ending March 31, 1983. This statement showed a net operating loss for

---

* Chief Judge of the United States Court of Appeals for the Federal Circuit, sitting by designation.

Greyhound's national bus division of over $20 million in those three months. Of that loss, Greyhound's New York intrastate passenger operations accounted for $500,450. This loss is in contrast to the overall profitability of Greyhound's New York combined inter and intrastate operations.[1] These combined operations had an operating ratio of 86.38 percent. ("Operating ratio" is a carrier's operating expenses expressed as a percentage of its revenues. Greyhound's 86.38 percent operating ratio means that for every dollar it earned in New York, Greyhound incurred 86.38 cents in expenses, thus earning a profit of 13.62 cents.) Greyhound also presented earnings projections for the pro forma year 1983. (The pro forma year is a twelve month period not necessarily coinciding with the calendar year. It is used to make financial projections.) From these earnings projections Greyhound estimated that its New York intrastate operating ratio, when adjusted to reflect certain fare increases recently granted by the NYDOT, would be 90.78 percent. In sum, Greyhound's financial exhibits showed: (1) that both Greyhound's national bus operations and its New York intrastate bus operations were currently losing money; (2) that Greyhound's New York interstate passenger services were profitable and effectively subsidizing its unprofitable intrastate operations; and (3) that if all estimates proved correct Greyhound's New York intrastate operations would become profitable—though still less so than its interstate operations—in the coming year.

The NYDOT suspended Greyhound's proposed fare increase and ordered an investigation. (Absent affirmative action by the state Greyhound's fare increase would have taken effect automatically. N.Y. Transportation Law § 142(11) (1975).) Following a hearing, a New York administrative law judge ("ALJ") denied the sought increase in its entirety. The ALJ acknowledged that "there is no question but that Greyhound's fares within New York are less than its interstate fares" but denied any fare increase because: (1) Greyhound's projected New York intrastate operating ratio indicated future profitability; and (2) over the previous five years New York had granted Greyhound intrastate fare increases greater than those allowed by the ICC for interstate operations.

Following the NYDOT's denial, Greyhound filed with the ICC a request for a forty percent rate increase pursuant to the Bus Regulatory Reform Act of 1982 ("Bus Act" or "Act"), codified at 49 U.S.C. § 11501. Under this provision, the ICC has authority to preempt state regulation and to prescribe intrastate bus fares when it finds that state action constitutes an "unreasonable burden" on interstate commerce. The statute further provides that the Commission shall presume a burdening of interstate commerce if it finds that certain facts—including a differential between inter and intrastate fares—exist. This presumption is, however, rebuttable. 49 U.S.C. § 11501(e)(2)(A)(i).

In proceedings before the ICC, Greyhound invoked this presumption that New York's rate regulation constituted an unreasonable burden on interstate commerce. In reply, the NYDOT acknowledged that Greyhound's New York intrastate fares are lower than comparable interstate fares.[2] However, it argued that its regulation did not constitute an unreasonable burden on interstate commerce because: (1) Greyhound's projected New York intrastate operating ratio indicates future profitability, (2) Greyhound has received substantial subsidies (and significant recent fare increases) from New York State, (3) Greyhound has been able to eliminate unprofitable

1. Intrastate passengers include all persons whose passage does not take them across state lines. A person remains an intrastate passenger even though the bus on which he rides does cross state lines and is engaged in interstate commerce. Thus, a given bus may carry both inter and intrastate passengers. *Cf.* 49 U.S.C. § 11501(e)(1) (1982).

2. A rate disparity is determined by comparing fares between two pairs of cities. The distance between the cities of either pair is equal but one route is interstate, the other intrastate.

routes in New York with minimal regulatory interference from NYDOT, and (4) Greyhound has a monopoly over a substantial number of routes in New York.

By way of rebuttal, Greyhound explained that its recent New York intrastate fare increases were high because the NYDOT previously had allowed only inadequate rate relief resulting in depressed New York intrastate fares. Greyhound also argued that its own projected earnings statement for the pro forma year was overly optimistic because it had been assumed that fare increases would go into effect earlier than in fact allowed. Moreover, Greyhound generally attacked the reliability of operating ratios as indicators of profitability. Greyhound further stated that New York's subsidy could not justify the proven rate discrepancy because it covered only variable costs [3] over particularly unprofitable routes and provided no money to meet fixed or fully allocated costs for those routes. In addition, Greyhound argued that there is no assurance these subsidies will continue. Finally, Greyhound asserted that it had not been able to eliminate unprofitable operations as easily as New York contended and that it had vigorous competition from Trailways, Amtrak, and independent airlines.

After consideration, the ICC issued its decision preempting New York State regulation of intrastate bus fares and granting Greyhound its requested forty percent fare increase. The Commission held that Greyhound had successfully invoked the statute's rebuttable presumption that state regulation burdened interstate commerce and that the evidence presented by the state failed to rebut that presumption.

On appeal, New York argues that the Commission misinterpreted the subject statute. It contends that the ICC acted improperly by (1) invoking the statutory presumption upon finding the existence of only one specified precondition and (2) according the statutory presumption excessive evidentiary weight. New York also contends that even if Greyhound could properly invoke the statute's presumption, NYDOT's evidence rebutted the presumption and clearly demonstrated that the state regulation did not constitute an unreasonable burden on interstate commerce. We address each of these contentions seriatim.

## II. DISCUSSION

New York's first contention is that the Commission has misinterpreted and consequently improperly applied the rebuttable presumption provision of 49 U.S.C. § 11501(e)(2). The relevant wording of the statute is set forth in the margin.[4] The

---

3. Variable costs are those costs that vary proportionally with miles travelled. Fuel costs are an example of variable costs.

4.     (e)(1) The Commission shall prescribe any rate, rule, or practice applicable to transportation provided entirely in one State by a motor common carrier of passengers providing transportation subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title—
    (A) if the carrier has requested the department, agency, or instrumentality of such State having jurisdiction over such rate, rule, or practice for permission to establish such rate, rule or practice and the request has been denied (in whole or in part) or the State authority has not acted finally (in whole or in part) on the request by the 120th day after the carrier made the request; and
    (B) if the Commission finds that the rate, rule, or practice in effect and applicable to such intrastate transportation causes unreasonable discrimination against or imposes an unreasonable burden on interstate or foreign commerce.
    (2) For purposes of paragraph (1)(B) of this subsection, there shall be a rebuttable presumption that—
    (A) any rate, rule, or practice applicable to transportation provided by a motor common carrier of passengers entirely in one State imposes an unreasonable burden on interstate commerce if the Commission finds—
    (i) that such rate, rule, or practice result in the carrier charging a rate for such transportation which is lower than the rate such carrier charges for comparable interstate transportation of passengers;
    (ii) on the basis of evidence presented by the carrier, that as a result of such rate, rule, or practice such carrier does not receive revenues from such transportation which exceed the variable costs of providing such transportation; or
    (iii) that the department, agency, or instrumentality of such State having jurisdiction

section provides that upon finding that certain conditions exist—included among these that intrastate rates are lower than interstate rates for comparable travel—the Commission shall presume that the challenged state regulation burdens interstate commerce.

The Commission, in granting Greyhound's request found that New York State regulation resulted in "the Carrier (Greyhound) charging a rate for (its intrastate) transportation which is lower than the rate such carrier charges for comparable interstate transportation of passengers...." The Commission ruled that this sufficed to invoke the Act's rebuttable presumption provision. New York challenges this interpretation.

New York argues that Greyhound could not properly invoke the Act's presumption that state regulation burdens interstate commerce unless the Commission could find *both* that Greyhound's New York intrastate fares were less than its fares for comparable interstate passages *and* that the most recent fare increase granted Greyhound by the NYDOT is less than that granted Greyhound by the Commission. New York's argument proceeds as follows: Section 11501(e)(2) states that in considering a carrier's request for relief from state regulation, the Commission shall utilize a rebuttable presumption that the challenged state regulatory practice burdens interstate commerce. It notes that section 11501(e)(2) contains two subsections: Subsection (A) contains a list of three conditions, one of which must be found to give rise to the rebuttable presumption. Subsection (B) states that the same presumption shall apply if the most recent general fare increase granted by the state is less than that allowed a carrier by the Commission. New York argues that because sub-

section (A) and (B) are joined by "and," the Commission before invoking the statutory presumption must find the existence of *both* any one of the three criteria listed in Subsection (A) *and* the situation described in Subsection (B).

We find New York's argument contrary to both the plain language and the legislative history of the Act, and thus we reject its interpretation.

Initially, we note that our role in reviewing an expert agency's interpretation of its own statute is limited. Because "the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong ..." we must give substantial deference to that interpretation. *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 598, 101 S.Ct. 1266, 1276, 67 L.Ed.2d 521 (1980). "(I)t is not necessary for a court to find that the agency's construction (is) the only reasonable one or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Federal Election Commission v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981). Thus, our task is "not to interpret the statute as [we think] best but rather the narrower inquiry into whether the Commission's construction [is] 'sufficiently reasonable' to be accepted by a reviewing court...." *Id.*

■ Turning to the statute, we find the Commission's interpretation both reasonable and correct. Section 11501(e)(2) states that in considering requests for preemption of state regulation the Commission shall utilize a presumption, and that that presumption shall be rebuttable. The two subsections thereof then go on to set forth two independent presumptions and the conditions that shall give rise to either. Subsec-

over such rate, rule, or practice failed to act finally (in whole or in part) on the request of the carrier to establish such rate, rule, or practice by the 120th day after the date the carrier made the request; and

(B) any rate applicable to transportation entirely in one State imposes an unreasonable burden on interstate commerce if the Com-

mission finds that the most recent general rate increase applicable to transportation provided by motor common carriers of passengers in such State is less than the most recent general rate increase applicable to interstate transportation provided by motor common carriers of passengers under this subtitle.

tion (A)'s presumption that state regulation burdens interstate commerce applies to any state "rate, rule, or practice applicable to transportation provided by a motor common carrier of passengers entirely in one State ..." and is to be invoked (1) if there is a disparity between inter and intrastate fares, (2) if the carrier does not receive income from its intrastate operations sufficient to cover the variable costs of providing such transportation, or (3) if the state agency having jurisdiction over the practice in question fails to act on a carrier's request for alteration thereof within 120 days. Subsection (B) contains a separate independent presumption applicable only to regulation of intrastate fares. Subsection (B)'s presumption that an intrastate passenger fare burdens interstate commerce is to be invoked whenever "the Commission finds that the most recent general rate increase applicable to [intrastate transportation] is less than the most recent general rate increase applicable to interstate transportation...." The "and" connecting the two subsections serves only to make clear that Subsection (B) is, as part of 11501(e)(2), a rebuttable presumption to be used in considering a carrier's request for Commission action. As such, "and" is more properly and reasonably read as "or".

Moreover, we find the Act's legislative history supports the Commission's interpretation and not that of NYDOT. Without resort to the section's rebuttable presumption, a carrier seeking preemption of state action would be required to engage in the laborious and time-consuming task of proving to the Commission that a particular challenged state practice burdens interstate commerce. Because Congress expressly found that excessive delays entailed in regulatory proceedings are themselves a burden on commerce, we cannot conclude that such a result was intended. See S.Rep. No. 97–411, 97th Cong. 2d Sess. (1982) ("Senate Report") at 8, U.S.Code Cong. & Admin.News 1982, p. 2308. In light of Congress' general concern with the burdensomeness of state regulation and its negative effects on interstate commerce, we believe that section 11501(e)(2) was in-

tended to have broader scope than New York's interpretation would allow it. (See Senate Report at 7–11; H.R.Rep. No. 97–334, 97th Cong. 2d Sess. (1982) ("House Report") at 24–27.)

Moreover, Congressional findings as to the effects of certain state practices on interstate commerce support the Commission's interpretation of Section 11501(e)(2). Each paragraph of Section 11501(e)(2)(A) represents a finding by Congress that the named condition—independent of its effect combined with that of any other rate, rule, or practice—unreasonably burdens interstate commerce. Congress found that when intrastate passenger fares are lower than interstate fares for comparable transportation, the more profitable interstate operations must in effect cross-subsidize the less profitable intrastate business (House Report at 25; Senate Report at 9–10), (2) that when intrastate operations are unprofitable, cross-subsidization occurs at an even higher level *id.*, and (3) that slow action by state regulatory agencies costs the industry millions of dollars each year and consequently burdens interstate commerce (Senate Report at 8; House Report at 25). In light of these findings, we would be unreasonable were we to require that the Commission, having found one of the conditions enumerated in 11501(e)(2)(A) to exist, also satisfy 11501(e)(2)(B) before it could invoke the Act's rebuttable presumption.

Finally, Congress' report on Section 11501(e)(2) supports the Commission's interpretation of that section. As Congress explained (H.R.Rep. No. 97–780, 97th Cong., 2d Sess. (1982) ("Conference Report") at 52–53, U.S.Code Cong. & Admin. News 1982, pp. 2363–2364):

*There is a rebuttable presumption that any intrastate bus rate, rule, or practice imposes an unreasonable burden on interstate commerce if the ICC finds that:* (1) such rate, rule, or practice results in the carrier charging a rate for intrastate transportation which is lower than the rate for comparable interstate transportation; (2) on the basis of the evidence presented by the carrier, that as

a result of such rate, rule or practice, the carrier does not receive revenues which exceed the variable costs of providing such transportation; *or* (3) the appropriate State authority failed to act finally on the request of the carrier to establish such rate, rule, or practice by the 120th day after the date the carrier made the request.

*Any rate applicable to solely intrastate transportation imposes an unreasonable burden* on interstate commerce *if* the ICC finds that the most recent general rate increase applicable to bus transportation in the State is less than the most recent general rate increase applicable to interstate common carrier bus transportation (emphasis added).[5]

Thus, it is clear that Congress envisioned four separate rebuttable presumptions, *viz* the three embodied in 11501(e)(2)(A) and the fourth separate presumption of 11501(e)(2)(B).

For the foregoing reasons we conclude that the Commission's interpretation of the act is correct and that the finding of disparity between Greyhound's New York inter and intrastate passenger fares was sufficient to give rise to the Act's presumption.

We now turn to New York's contentions that it adequately rebutted any presumption that its regulation burdens interstate commerce and that the Commission failed to make adequate findings to support its rejection of New York's rebuttal evidence.

■ Relying on *North Carolina v. United States*, 325 U.S. 507, 511, 65 S.Ct. 1260, 1263, 89 L.Ed. 1760 (1945), New York argues that the I.C.C.'s decisions to preempt state regulatory authority must meet a "high standard of certainty" and that the justification for the exercise of federal power "must clearly appear" in the Commission's opinion. We find *North Carolina v. U.S.* inapposite and, hence, we reject this argument. *North Carolina v. U.S.* involved the interpretation of section 13(4) of the Interstate Commerce Act, 49 U.S.C.

§ 13(4). Under that Act, the Commission was allowed limited authority to preempt state regulation of intrastate rail rates. The Commission could exercise this authority only if it found after investigation and "full hearing" that an intrastate rate caused "unjust discrimination" against interstate commerce. The situation here is considerably different. In passing the Bus Act in 1982, Congress was concerned that regulation in general and state regulation in particular had substantially undermined the financial base of the bus industry. See Senate Report at 7–11; House Report at 24–27. Congress realized that state regulation often kept intrastate fares at artificially low levels and forced bus companies to continue operating unprofitable intrastate routes. Congress appreciated that these practices effectively forced bus companies to subsidize intrastate operations by overcharging interstate passengers and realized that under the Act, the ICC necessarily would preempt state regulation in order to eliminate these burdens on interstate commerce. See House Report at 44; Senate Report at 7–8; Conference Report at 52. Thus, Congress has made a decision to allow substantial preemption of state regulatory authority (see Senate Report at 7–8; House Report at 24), and the role of this Court in reviewing such a decision is clearly different from that it assumes in considering Commission action which is taken pursuant to less explicit or less broad authority. We therefore hold that the rigid requirements of *North Carolina v. U.S.* do not apply to the Commission's decisions made pursuant to the Bus Act. Rather, review of the Commission's decision herein is governed by 5 U.S.C. § 706, and we can "set aside agency action, findings, and conclusions [only if] found to be ... arbitrary [or] capricious...." Judging the Commission's action by this standard, we hold that it must stand.

Against Greyhound's invocation of section 11501(e)(2)'s presumption, New York

**5.** We note that the "and" upon which petitioners rely so heavily is absent from the Conference Report.

presented four arguments that the Commission rejected. New York argued (1) that Greyhound's projected New York intrastate operating ratio showed that those operations would become profitable and hence could not be a burden on interstate commerce, (2) that New York had allowed Greyhound to pare unprofitable routes with minimal difficulty, (3) that Greyhound possessed substantial monopoly power over certain parts of the state, and (4) that New York had provided Greyhound with substantial subsidies. The Commission rejected these arguments finding that, excepting the subsidy issue, none of New York's arguments indicated differences in operating conditions or cost of services, and that only such factors could justify holding intrastate fares at levels lower than those allowed for comparable interstate transportation. We deal with each of these rebuttal arguments in turn.

■ New York relies principally on Greyhound's projected intrastate operating ratio as evidence that its fare regulation does not burden interstate commerce. Greyhound's financial projections for the 1983 pro forma year show a 90.78 intrastate operating ratio. (In other words, for every dollar of revenues that Greyhound collects, it incurs 90.78 cents in expenses.) Greyhound argued before the Commission that this operating ratio is insufficient to rebut § 11501(e)(2)'s presumption. Specifically Greyhound argues that operating ratios (especially those based on pro forma year projections) are too unreliable to be accepted as evidence that state fare regulation does not burden interstate commerce. The Commission apparently accepted this argument. We agree with Greyhound and the Commission.

The calculation of intrastate versus combined operating ratios involves a number of highly arbitrary accounting assumptions used to allocate revenues and expenses between intra and interstate operations. This

is necessary because both types of service are simultaneously provided on one bus: a given bus typically contains both interstate and intrastate passengers. The normal method for allocating expenses between the two operations is on the basis of passenger miles.[6] The major problem with this method is that many costs do not vary proportionally with the length of a trip, e.g., costs of ticketing, baggage handling, and other station expenses. Consequently, the actual cost per mile of shorter trips is typically significantly higher than that of longer ones. Because, *intra* state trips are typically shorter than *inter* state trips, the expenses allocable to the former are necessarily underestimated by an accounting method which assigns expenses on the basis of passenger miles.[7] Thus the Commission could reasonably conclude that the operating ratio evidence presented by New York was unreliable and insufficient to rebut Section 11501(e)(2)'s presumption.

Moreover, we note that the operating ratio evidence may be irrelevant. New York concedes that Greyhound's projected combined inter and intrastate operating ratio is 81.63 and is thus significantly more profitable than its projected intrastate operating ratio. (Greyhound's 1982 combined New York inter and intrastate operating ratio was 86.38 and is also more profitable than either its proven 1982 or projected 1983 intrastate operating ratio.) Thus, to the extent that market forces allow, Greyhound has raised its *inter* state fares above intrastate levels in order to increase overall profitability to a level the ICC considers appropriate. Given this situation, interstate operations are subsidizing intrastate operations. Thus, we conclude that the Commission's rejection of New York's operating ratio evidence was neither "arbitrary" nor "capricious."

■ We next address New York's arguments that because it had allowed Greyhound to eliminate unprofitable routes with

---

6. A passenger mile is one mile travelled by one passenger. Thus, ten passengers travelling ten miles each would have travelled one hundred passenger miles.

7. *See* MC-C-10901, Petition of Greyhound Lines, Inc., for Review of a Decision of the West Virginia Public Service Commission Pursuant to 49 U.S.C. § 11501 (April 13, 1984).

minimal difficulty and because Greyhound has monopoly power in substantial areas of the state, the proven disparity between inter and intrastate fares does not burden interstate commerce. The Commission rejected these arguments as irrelevant because they do not evidence any difference in operating costs or conditions. We agree with the Commission. Although these arguments may support the wisdom of regulation in general and the beneficence of New York's regulation in particular, they do not significantly relate to the existing disparity between inter and intrasate passenger fares to rebut the statutory presumption.

Finally, we turn to the subsidy that New York, in the past, has granted Greyhound. In its decision, the Commission agreed with New York that the subsidy did reflect on differences in operating costs and conditions. However, the Commission concluded that the possibility of a continuing subsidy was not sufficient to justify the existing rate disparity. The Commission noted that Greyhound had presented evidence showing that the subsidy provided funding sufficient only to cover variable costs over certain extremely unprofitable routes, that no subsidy was provided to cover fixed costs, and that the subsidy was not permanent and probably would not be available in the future. Considering these arguments, the Commission concluded that (1) the subsidy was not permanent (and indeed New York conceded it would not be available in the coming year), (2) even with the subsidy factored proportionally into Greyhound's intrastate rates those rates would be significantly lower than its interstate rates, and (3) hence the subsidy was insufficient to rebut the Bus Act's presumption that the rate disparity herein burdens interstate commerce. Viewing the evidence, we find the Commission's decision reasonable.

### III. CONCLUSION

We conclude that the Commission correctly interpreted 49 U.S.C. § 11501(e)(2) when it determined that the existence of a rate disparity was, without more, sufficient to invoke the Act's rebuttable presumption provision. We further conclude that the Commission did not act arbitrarily or capriciously in rejecting New York's attempt to rebut the Act's presumption. For these reasons, we affirm the Commission's decision.