The AMERICAN SHORT LINE RAILROAD ASSOCIATION, et al., Petitioners,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents,

Canadian Pacific Limited and The Chesapeake and Ohio Railway Company, et al., Intervening Petitioners,

Consolidated Rail Corporation and Chemical Manufacturers Association, Intervening Respondents.

No. 11, Docket 84–4023.

United States Court of Appeals, Second Circuit.

Argued Oct. 22, 1984.

Decided Dec. 18, 1984.

William Hughes Mulligan, New York City (Brian C. Mohr, Kathryn Keneally, Skadden, Arps, Slate, Meagher & Flom, New York City, Thomas C. Dorsey, Washington, D.C., James L. Howe, III, Roanoke, Va., Louis P. Warchot, San Francisco, Cal., Richard E. Weicher, Chicago, Ill., of counsel), for petitioners.

Craig M. Keats, I.C.C., Washington, D.C. (J. Paul McGrath, Asst. Atty. Gen., Barry Grossman, Margaret G. Halpern, Dept. of Justice, John Broadley, Gen. Counsel, Lawrence H. Richmond, Deputy Associate Gen. Counsel, Washington, D.C., of counsel), for respondents.

John L. Oberdorfer, Washington, D.C. (Allan A. Tuttle, Scott N. Stone, Patton, Boggs & Blow, Washington, D.C., David F. Zoll, Kenneth M. Kastner, Washington, D.C., of counsel), for intervening respondent Chemical Manufacturers Ass'n.

Bruce B. Wilson, Constance L. Abrams, Robert C. Lopardo, Philadelphia, Pa., of counsel, for intervening respondent Consol. Rail Corp.

Richard J. Flynn, Terence M. Hynes, Sidley & Austin, Washington, D.C., of counsel, for intervening petitioner Canadian Pacific Ltd.

Roland W. Donnem, Charles C. Rettberg, Jr., Rachel E. Geiersbach, Cleveland, Ohio, James C. Schultz, Emried D. Cole, Jr., Jacksonville, Fla., Urchie B. Ellis, Richmond, Va., of counsel, for intervening petitioner Chesapeake and Ohio Ry. Co., et al.

Before PIERCE and PRATT, Circuit Judges, and PALMIERI, Senior District Judge.[*]

PIERCE, Circuit Judge:

This is an appeal from a decision of the Interstate Commerce Commission ("ICC" or "Commission"), Ex Parte No. 447, *Petition to Delay Application of Direct Connector Requirement to Joint Rail Rates in General Increases*, 367 I.C.C. 886 (1983), entered December 28, 1983, denying petitioning railroads' request to delay implementation of the "direct connector standard" of the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat.1895, amended 49 U.S.C. § 10706(a)(3)(B) with regard to inflationary cost recovery. Petitioners allege that the ICC misinterpreted the "feasibility" criterion and that the direct connector standard is presently not feasible. They therefore seek a three year delay in its implementation.

Intervenor Chesapeake and Ohio Railway Company ("CSX") generally supports the decision but requests a proceeding to consider antitrust immunity for alternative plans submitted to implement the direct connector standard. Intervenor Canadian Pacific Limited ("CP") supports petitioners' position and requests reversal because of ICC's failure expressly to have allowed Canadian carriers to negotiate as a group with their direct connectors within the United States.

We hold that the ICC did not err in its interpretation of the feasibility standard and that it properly exercised its discretion in denying petitioners' request for a delay.

---

[*] The Honorable Edmund L. Palmieri, Senior District Judge, Southern District of New York, sitting by designation.

We also hold that CSX' request for an additional proceeding is unripe and moot and that its claim may not be considered by this court since it was not raised before the Commission. In sum, we affirm the decision of the ICC.

## BACKGROUND

Petitioners, twenty large and small railroads and the American Shortline Railroad Association, representing an additional 266 railroads operating in the United States, sought a finding by the ICC that current implementation of the Staggers Act restriction on collective ratemaking with regard to inflationary cost recovery is not feasible.

Under 49 U.S.C. § 10701(a), the ICC is authorized to determine whether railroad rates are reasonable. Toward this end, tariffs establishing or changing rates are filed by each railroad with the Commission. These rates can be for either a single-line or joint-line, i.e., they can apply either to a single route of an individual carrier or to a joint route in which more than one railroad participates. For joint-line or interline routes, in which traffic moves over two or more railroads, "single factor" or "joint rates" are calculated to provide shippers with a single fee.

Prior to enactment of the Staggers Act, railroads subject to regulation by the ICC were permitted to set rates collectively with other carriers. *See Section 5a Application No. 2, Western Traffic Ass'n— Agreement,* 276 I.C.C. 183, 185–91 (1949). The carriers established rate bureaus to facilitate negotiation of these collective rates and to ensure rate uniformity. H.R. Rep. No. 1035, 96th Cong., 2d Sess. 119–21 (1980), *reprinted in* 1980 U.S.Code Cong. & Ad.News 4063–65. Provided the agreement establishing a rate bureau was approved by the Commission, the carriers' activities in a rate bureau were not con-

sidered to be violative of the antitrust laws. 49 U.S.C. § 10706(a)(2)(A). For example, railroads were given antitrust immunity to determine through the rate bureaus how much of an increase was necessary to offset their inflationary costs. The rate bureaus acted as their members' agents and filed petitions for rate increases with the Commission, demonstrating the impact of inflation on the railroads' costs. Shippers then had the opportunity to object. A single railroad could not, however, alter a rate without the "concurrence" of all participating carriers. 49 U.S.C. § 10762(b)(2). *See* 49 U.S.C. § 10705(a)(1), (c)–(f); H.R.Rep. No. 1430, 96th Cong., 2d Sess. 111–12 (1980), *reprinted in* 1980 U.S.Code Cong. & Ad.News 4143.

Pursuant to the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94–210, 90 Stat. 35 (the "4R Act"), the forerunner of the Staggers Act, Congress amended the ICC's authority to regulate railroad rates. *Green Bay and Western Railroad Co. v. United States,* 644 F.2d 1217, 1227 (7th Cir.1981). Introducing the concept of "market dominance," the 4R Act permitted rate regulation by the ICC only in the "absence of effective competition," 49 U.S.C. § 10709(a), and, to encourage such competition and individual ratemaking, the Act prohibited certain collective action. Rate bureaus were precluded from allowing their members to vote on or discuss single line rates established by member carriers or joint rates in which members did not "practically participate," § 208(b) of the 4R Act; H.R.Rep. No. 781, 94th Cong., 2d Sess. 153–54 (1976). In accordance with the Act's procompetitive thrust, four years after passage of the 4R Act, the Commission, in *Section 5b Application No. 2, Western Railroads—Agreement,* 364 I.C.C. 1 (1980), stated that collective action was contrary to the public interest.[1]

---

1. The Commission stated that collective action tends to inflate rate levels through setting of uniform rates acceptable to a majority of carriers, including the less efficient. It creates an atmosphere of consensus which dis-

courages the establishment of innovative price and service options by individual carriers. Competition gives carriers an incentive to price their services in closer alignment with the actual costs of providing those ser-

In 1980, Congress enacted the Staggers Act, 49 U.S.C. § 10101 *et seq.*, which expanded the 4R Act and continued its policy of encouraging competition.[2] Essentially, railroads were permitted to discuss rate changes only with their "direct connectors" in a particular joint-line movement, i.e. with those railroads that "practically partici-pate[d]" with them in handling traffic over a particular route. 49 U.S.C. § 10706(a)(3)(A)(ii), (A)(iii) & (B). *See Section 5b Application No. 2, Western Railroads—Agreement*, 364 I.C.C. 635, 651 (1981).

The statute draws a distinction between, on the one hand, collective activity concerning single line rates (§ 10706(a)(3)(A)(i)), interline rates in which the carriers do not practically participate (§ 10706(a)(3)(A)(ii)), and interline rates for alternative routes between any two points (§ 10706(a)(3)(A)(iii)), and, on the other hand, collective activity involving general increases to cover inflationary costs (§ 10706(a)(3)(B)(i)) or broad tariff changes (§ 10706(a)(3)(B)(ii)). The restrictions on carriers which do not practically participate were to be effective immediately. The provisions prohibiting

collective activity on single line rates and on rates for alternative routes were to become effective unless the Commission were to find implementation not feasible, in which case it could suspend or delay implementation.[3]

For the remaining two provisions, prohibiting collective activity with regard to broad tariff changes and prohibiting collective activity to cover inflationary cost increases, the provision at issue in the instant case, Congress granted a three-and-one-quarter year grace period until January 1, 1984. Moreover, Congress also gave the Commission discretionary power to suspend or delay implementation if it found that implementation were shown to be not feasible.

At the same time that the Staggers Act placed restrictions on collective ratemaking for inflationary cost recovery, it also lifted certain barriers, enabling carriers to recoup inflationary costs without regulatory interference. Section 203 of the Staggers Act, 49 U.S.C. § 10707(a), authorizes the railroads to develop an index reflecting the estimated effect of inflation on their operating costs in the following quarter and

---

vices. We believe shippers, carriers, and the public will benefit from additional competition among rail carriers.
364 I.C.C. 1, 12–13 (1980).

2. The Staggers Act, 49 U.S.C. § 10706(a)(3), in pertinent part provides:

(3)(A) [A rate bureau] may not—
(i) permit a rail carrier to discuss, to participate in agreements related to, or to vote on single line rates proposed by another rail carrier, except that for purposes of general rate increases and broad tariff changes only, if the Commission finds at any time that the implementation of this clause is not feasible, it may delay or suspend such implementation in whole or in part;
(ii) permit a rail carrier to discuss, to participate in agreements related to, or to vote on rates related to a particular interline movement unless that rail carrier practically participates in that movement; or
(iii) if there are interline movements over two or more routes between the same end points, permit a carrier to discuss, to participate in agreements related to, or to vote on rates except with a carrier which forms part of a particular single route. This clause shall take effect on January 1, 1984, or on such earlier date as the Commission determines.

If the Commission finds at any time that the implementation of this clause is not feasible, it may delay or suspend such implementation in whole or in part.
(B) Until January 1, 1984, subparagraph (A)(ii) and (A)(iii) of this paragraph do not apply to
(i) general rate increases to cover inflationary cost increases....
If the Commission finds at any time that the implementation of this subparagraph is not feasible, it may delay or suspend such implementation in whole or in part.

3. In *Section 5b Application No. 2, Western Railroads—Agreement*, 364 I.C.C. 635, 642–53 (1981), the Commission implemented 49 U.S.C. § 10706(a)(3)(A). In holding that it would not be feasible to implement the direct connector standard with regard to single-line rates or rates for alternative routes, the Commission balanced any "concrete evidence of harm" of individual ratemaking against the "underlying policies of [the Staggers Act]", 364 I.C.C. at 643–44, and "the [Staggers Act's] general thrust in favor of efficiency in carrier operations." *Id.* at 650. The Commission rejected the railroads' prediction that individual ratemaking would lead to "rate chaos." *Id.* at 651.

then to submit the index to the Commission for verification. If the verified index, the "rail cost adjustment factor," projects an increase in costs for the next quarter, the railroads are permitted, without additional regulatory action, to increase their regulated rates for all commodities they transport by the percentage necessary to recover these projected costs.

Since joint rates may be increased only by mutual concurrence, 49 U.S.C. § 10762(b)(2), petitioners allege that the direct connector restriction on collective ratemaking practically impairs their recovery of inflationary costs. Petitioners further allege that, by impairing inflationary cost recovery, the direct connector standard precludes realization of what they consider the primary goal of the Staggers Act, namely, enhancement of railroad revenue adequacy. Therefore, petitioners sought a finding by the ICC that application of the direct connector ratemaking restriction to inflationary cost recovery is presently infeasible and requested an additional delay of three years in its implementation.

In response to the railroads' petition, the ICC issued a Notice of Proposed Rulemaking in the *Federal Register*, 48 Fed.Reg. 41, 464 (1983) soliciting public opinion on whether implementation of the direct connector restriction was "not feasible." The petitioning railroads filed comments in which they argued that collective procedures for recovering increased costs are not really anticompetitive, and that the only feasible alternative to collective activity is cumbersome separate negotiations among the various railroads for each rate increase. The National Industrial Transportation League, representing many of the Nation's shippers, filed comments supporting petitioners' request for a finding of infeasibility, but suggested that only a one year delay was necessary.

Several parties submitted comments opposing the railroads' petition for a delay, including the Department of Justice ("DOJ"), the Department of Transportation ("DOT"), Consolidated Rail Corporation ("Conrail"), CSX Railroads, Burlington Northern ("BN"), and Chemical Manufacturers Association ("CMA"). The DOT and Conrail submitted plans for implementing direct connector ratemaking without requiring the individual negotiations contemplated by petitioners. According to the DOT "independent factor joint rate" plan, any railroad could alter its portion of a rate unilaterally, but the individual segments would be published as a joint-line tariff, for the convenience of the shipper. According to the Conrail plan, which was supported by BN, CSX, and, tentatively, the DOJ, each railroad would submit to the tariff publishing officer ("TPO") the percentage of the Commission authorized increase it intended to implement. The TPO would then publish a tariff listing the increases specified by each railroad. On the assumption that all of the participating carriers could be deemed to have concurred in the lowest percentage increases submitted, the increase ultimately put into effect would be the lowest percentage increase selected by any of the participating carriers. Under both the DOT and Conrail plans, the railroads would not have to engage in individual negotiations. Furthermore, under either plan, railroads would be free to negotiate directly with their direct connectors. Petitioners noted difficulties with the Conrail plan, both mechanical and antitrust, and requested that the ICC conduct a separate sub-proceeding to study its feasibility.

Given the statutory goal of rate competition, the existence of alternative plans implementing the direct connector standard without tedious individual ratemaking, and the ICC's findings that petitioners did nothing to begin to implement the rate restrictions and failed to present evidence of concrete economic harm, the ICC held that petitioners had not shown that implementation of the statutory scheme was not feasible. Therefore, the Commission denied petitioners' request for a three year delay in the application of the direct connector ratemaking restriction to inflationary cost recovery. This appeal followed.

Since CSX supported Conrail's proposal but was concerned about its antitrust impli-

cations, CSX requested that the Commission conduct a sub-proceeding to consider this issue. Recognizing that the onus is on petitioners to develop a plan for implementing the direct connector standard, the Commission refused CSX' request to evaluate Conrail's proposal. In denying CSX' request, the Commission stated in *dictum:* "Since we will lose our authority to grant antitrust immunity after the direct connector standard goes into effect, any questions about whether the Conrail plan or any other plan violates the antitrust laws should be directed to the DOJ, not the Commission." 367 I.C.C. 896 n. 16. CSX intervened in the instant proceeding to seek review of this statement by the Commission.

CP intervened in the present action on behalf of petitioners to assert an additional reason for a finding of infeasibility. Since the Canadian Railway Act permits collective ratemaking among Canadian rail carriers, CP alleges that the Commission's decision ignored principles of international comity by not expressly allowing Canadian carriers to negotiate collectively with their direct connectors in the United States.

### DISCUSSION

### Feasibility of the Direct Connector Standard

Petitioners' main contention is that the Commission erred in its interpretation of the term 'feasible' and, thus, in its holding that there was insufficient proof to substantiate the railroads' claim that present implementation of the direct connector standard is 'not feasible.' Petitioners go even further and state that "Congress imposed on the ICC a duty to determine the subsequent workability and practicability of utilizing the direct connector standard" (Petitioners' Br. at 16), implying that the Staggers Act requires the ICC to make a positive determination of feasibility.

■ Petitioners' contention that the Commission is required to make an affirmative determination regarding the feasibility of direct connector ratemaking is without merit. The statute expressly states that collective ratemaking shall end on January 1, 1984 unless the Commission "finds at any time that implementation . . . is not feasible." 49 U.S.C. § 10706(a)(3)(B). Furthermore, while the Senate version of the legislation which became the Staggers Act would have imposed a duty on Congress to make a positive finding of feasibility, S.Rep. No. 470, 96th Cong., 1st Sess. 53 (1979), the Conference Committee, refusing to impose such an affirmative obligation, rejected the Senate's approach. H.R.Rep. 1430, 96th Cong., 2d Sess., 113–14 (1980). Thus, both the plain language and legislative history of the statute refute petitioners' claim regarding a positive finding of feasibility.

■ Similarly, contrary to petitioners' contention, the ICC's interpretation of the term 'feasible' is consistent with the plain meaning and dictionary definitions of the term. Petitioners provide two definitions of 'feasible'—"capable of being done or carried out," Webster's Ninth New Collegiate Dictionary 453 (1983), and "capable of being managed, utilized or dealt with successfully." Webster's Third International Dictionary of the English Language 831 (1976). (Petitioners' Br. at 14). In support of their argument that the restriction on collective ratemaking is not feasible, petitioners offer evidence that the scheme would cause delay in implementing inflation based increases, resulting in a loss of revenue to the railroads. (Petitioners' Br. at 35). Petitioners allege that each carrier would be required to negotiate with each combination of other carriers with which it participates in joint rates, thereby resulting in delay. In addition, since direct connector ratemaking multiplies the number of required agreements, petitioners claim that the statutory scheme would produce increased costs.[4]

---

**4.** Such delay and increased cost is further exacerbated, according to petitioners, by several factors complicating the rail industry joint rate

structure—e.g., the different rate provided for each commodity transported; the special modification of railroad cars demanded of particular

Based on either definition of feasibility, however, neither delay nor loss of revenue necessarily implies that the restriction on collective ratemaking is not feasible. Despite resulting delay or reduced recovery, the restriction may still be "capable of being implemented."[5] Further, even if the restriction does cause delay and reduced recovery, the ICC could still have justifiably concluded that the restriction was feasible, in the sense of "capable of being managed ... successfully," in light of the statutory goals that the restriction was intended to achieve.

Not only is the ICC's interpretation of 'feasible' consistent with the ordinary definitions of the term, it is also consistent with the legislative history of the Staggers Act and the goals Congress wanted to realize in enacting the legislation.

The purposes of the Staggers Act are clearly enunciated, revealing its dominant procompetitive objectives. The statute was enacted: "to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates," 49 U.S.C. § 10101a(1); "to promote a safe and efficient rail transportation system by allowing rail carriers to earn adequate revenues," *id.* at § 10101a(3); "to ensure effective competition among rail carriers," *id.* at § 10101a(4); and "to require rail carriers, to the maximum extent practicable, to rely on individual rate increases." *Id.* at § 10101a(11). Moreover, the Congressional Conference report further emphasizes the central role of competition in the mind of Congress when it enacted the legislation.[6] It is axiomatic that the words of a statute should be interpreted in the context of congressional purposes, *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 103

S.Ct. 986, 994, 74 L.Ed.2d 845 (1983), and thus we conclude that the Commission was correct in its interpretation of 'not feasible.' *See Water Transport Ass'n v. I.C.C.*, 722 F.2d 1025, 1031 (2d Cir.1983) (phrase "essential terms" in Staggers Act must be interpreted in light of purposes of Act).

While admitting that competition is a goal of the Staggers Act, petitioners argue that the primary objective of the Act is to promote railroad "revenue adequacy," and that the anticollective ratemaking provisions are to be evaluated as only one route toward this end. (Petitioners' Br. at 17). Several factors favor upholding the Commission's interpretation of congressional purpose. First, the language of the Act itself highlights the central importance of competition by specifically mandating that competition is to determine rates to the *maximum extent possible*, § 10101a(11), and that rail carriers are to rely on individual rate increases *to the maximum extent practicable*, § 10101a(1). Second, although in enacting the Staggers Act, the railroads' financial well-being was clearly a major concern of the Congress, the Act tries to achieve railroad revenue adequacy by means of the interaction of competitive forces. As noted by the Commission, Congress recognized that the way to attain revenue adequacy for the railroads was through individual pricing mechanisms, rather than through collective ratemaking. 367 I.C.C. 892–94. Third, Congress enacted the procompetitive provisions of the Staggers Act after finding that collective ratemaking was a partial cause of the railroads' pre-Staggers financial difficulties. H.R.Rep. No. 1035, 96th Cong., 2d Sess., 34–38 (1980). Therefore, contrary to petitioners' argument, it is not likely that Con-

---

shippers; and the competition from other forms of transportation, as well as from other railroads themselves.

**5.** In *American Textile Mfrs. v. Donovan,* 452 U.S. 490, 520–21, 101 S.Ct. 2478, 2496, 69 L.Ed.2d 185 (1981), e.g., in connection with the Occupational Safety and Health Act of 1970, the Supreme Court held that the term feasible does not mean cost-benefit.

**6.** The Conference report states: "[t]he Conferees believe that railroads, shippers, and consumers will benefit from increased rail-to-rail competition, and expect that the Commission will interpret the term ['practically participate'] in a manner which encourages competition while maintaining a rail system which functions efficiently." H.R.Rep.No. 1430, 96th Cong., 2d Sess. 114 U.S.Code Cong. & Admin.News 1980, p. 4146 (1980).

gress viewed collective action as a preferred route to achieving financial recovery for the railroads. Fourth, the Commission's decision in the instant case is consistent with its prior decisions. In *Section 5b Application No. 2, Western Railroads—Agreement*, 364 I.C.C. 635 (1981), e.g., the ICC held that "[t]he major premises of both the 4R Act and the SRA [Staggers Rail Act] are the encouragement of rail competition, and to allow individual carriers to price their services according to individual costs and revenue need." *Id.* at 644. *See Section 5b Application No. 2, Western Railroads—Agreement*, 365 I.C.C. 918 (1982).

Furthermore, not only must the Commission's decision be sustained unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1982); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 2865, 77 L.Ed.2d 443 (1983); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971), but, since we believe the agency's statutory interpretation is consistent with congressional purposes, *Katharine Gibbs School (Inc.) v. Federal Trade Commission*, 612 F.2d 658, 664 (2d Cir.1979), the Commission's interpretation of the Staggers Act should be given great deference. *Federal Election Commission v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981); *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 598, 101 S.Ct. 1266, 1276, 67 L.Ed.2d 521 (1980); *The Commissioner of Transportation of the State of N.Y. v. United States of America & I.C.C.*, 750 F.2d 163 (2d Cir.1984); *Connecticut Fund for Environment, Inc. v. EPA*, 696 F.2d 169, 173–74 (2d Cir.1982) (agency's inter-

pretation of its governing statute is entitled to great deference).

Herein, the ICC's decision was clearly not arbitrary, capricious or an abuse of discretion. Rather, it was based upon numerous arguments presented to the ICC as a result of its call for public comment.[7] Among other things, the Commission considered the plans submitted to it by the DOT and Conrail. It concluded that the alternatives suggested show that the direct connector standard would not necessarily lead to the cumbersome individual negotiations predicted by petitioners and, therefore, that the statutory scheme could not be said to be infeasible. Petitioners contend, however, that, without a sub-proceeding, the ICC should not have considered the Conrail Plan since it "is untested and raises grave legal issues." We agree with the ICC that because it is not required to make an affirmative finding of feasibility under § 10706(a)(3)(B), petitioners may not legitimately object to the ICC's considering the plan, even though it is untested. With regard to the claim of "grave legal issues," the Commission reasonably noted, based on comments from the DOJ, that no significant antitrust problems exist with the Conrail plan. 367 I.C.C. 886, 896 n. 16. As CMA states, on May 22, 1984, the DOJ issued a business review letter commenting approvingly on the Conrail plan.

In addition to the plans submitted by Conrail and the DOT, the Commission took into consideration petitioners' failure to show that they had explored any alternatives of their own during the three-and-one-quarter year statutory grace period. Given the clear January 1, 1984 deadline imposed by Congress, § 10706(a)(3)(B), and the grace period provided, it was reasonable for the Commission to conclude that "the carriers have the burden of using their new freedoms to find new ways to price their services without antitrust immunity," 367 I.C.C. 886, 894, and that by doing nothing,

---

**7.** In notice-and-comment rulemaking, the decision-making body may consider all comments which are submitted, and no requirement exists that the decision be supported by record evidence 5 U.S.C. § 556(d); *United States v. Florida*

*East Coast Railway Co.*, 410 U.S. 224, 234–35, 93 S.Ct. 810, 815–16, 35 L.Ed.2d 223 (1973); *National Nutritional Foods Ass'n v. Weinberger*, 512 F.2d 688, 700–01 (2d Cir.), *cert. denied*, 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975).

the railroads had failed to act as "reasonably prudent businessmen." *Id.* at 896. Moreover, in the absence of a showing that petitioners explored alternative means for implementing the direct connector standard, petitioners' objection to the Conrail plan because it is "untested" is unpersuasive.

The Commission also observed that, as required by the Staggers Act, railroads are already implementing inflationary cost recovery rate changes without collective action. *Id.* at 894. Subsequent to the ICC decision herein, an inflationary cost recovery tariff increase, resulting from route to route rather than collective negotiations, was authorized to be taken in full on July 1, 1984 by all of the Nation's railroads, Rail Carrier Cost Recovery Tariff, RCCR X084–A, further indicating that the direct connector standard is not infeasible.

Finally, the Commission considered evidence regarding the costs of implementing the direct connector standard. In its comments, the DOT pointed out, and petitioners concede, the number of regulated joint rates, the only ones to which the direct connector standard applies, has been decreasing and is likely to continue to decrease. Furthermore, the Commission notes that the bulk of rail traffic moves in single-line, rather than joint-line service. *Id.* Consequently, the Commission concluded that petitioners have "greatly overstated the magnitude of any increase in transaction costs which would occur from the timely implementation of the statute." *Id.* We are not persuaded to the contrary.

In arguing that collective action to recover inflationary costs is not anticompetitive in the same way that collusive price-fixing is (Petitioners Br. at 30), petitioners admit that competitive pressures often limit inflationary increases actually taken.[8] This suggests that, in many instances, railroads would continue to act independently, even after implementation of the direct connector standard, thereby further reducing the burden that implementation would place on

petitioners. Moreover, any increased competition among the railroads themselves, which might well result from individual as opposed to collective ratemaking, would tend to further promote, rather than thwart, the objectives of Congress in enacting the Staggers Act.

■ Based on the foregoing, we conclude that the Commission's finding that petitioners failed to offer sufficient evidence of concrete economic harm and the Commission's interpretation of the Staggers Act are neither arbitrary, capricious, an abuse of discretion, nor inconsistent with the law and are therefore entitled to great deference. *Newsweek, Inc. v. U.S. Postal Service,* 663 F.2d 1186, 1197 (2d Cir.), *cert. denied,* 457 U.S. 1133, 102 S.Ct. 2959, 73 L.Ed.2d 1350 (1981). The Commission found that revenue adequacy for railroads, while an important goal, does not override Congress' interest in promoting competition. As the Commission states, "Congress determined that the potential welfare loss associated with collusion outweighed possibly ... higher transaction costs associated with competitive ratemaking." 367 I.C.C. 886, 893–94. Therefore, we uphold the interpretation by the Commission of the Staggers Act, including its views as to feasibility.

*Claims of Intervenors CSX and CP*

Intervenor CSX generally supports the Commission's decision but intervened herein for the limited purpose of seeking review of the Commission's *dictum* that it "will lose [its] authority to grant antitrust immunity after the direct connector standard goes into effect." *Id.* at 896 n. 16. CSX maintains that, if need be, the Commission could make a "not feasible" finding in the future.

■ We consider the issue presented by CSX to be both unripe and moot. As noted by the ICC, no party raised the question before it of whether and under what circumstances the Commission could reopen

8. Petitioners state: "The overriding need of the rail industry to stay competitive with other modes of transportation, as well as each railroad's interest in keeping a joint rate competi-

tive with its competing single-line rates or with its other joint rates, constrain anticompetitive conduct in setting joint rates." (Petitioners' Br. at 31).

the proceeding in the future to make a finding of infeasibility. Moreover, in *Section 5b Application No. 2, Western Railroads—Agreement*, ICC Docket No. § 5b Application No. 2, not printed, served May 7, 1984 at 6–7, the Commission stated that situations could arise in which the Commission may have occasion to make a "not feasible" finding in the future. In our view, CSX' concern is not an issue which we need address.

■ With regard to CP's claim that the Commission ignored principles of international comity, we hold that CP's failure to raise this issue before the ICC precludes it from being raised on appeal. *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952) ("[s]imple fairness ... requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection.") *NLRB v. GAIU Local 13-B*, 682 F.2d 304, 312 (2d Cir.), *cert. denied*, 459 U.S. 1200, 103 S.Ct. 1183, 75 L.Ed.2d 431 (1982), quoting *Tucker Truck*.

■ For the foregoing reasons, we affirm the ICC's decision denying petitioning railroads' request to delay implementation of those provisions of the Staggers Act relating to inflationary cost recovery.